IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 382 |
| | ) | |
| BOARD OF ELECTION | ) | Judge St. Eve |
| COMMISSIONERS FOR THE CITY OF | ) | |
| CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
DISMISS AND IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

The defendant, the State of Illinois, by its attorney, Lisa Madigan, submits the following memorandum of law in support of its motion to dismiss. The plaintiff has also moved for a preliminary injunction, and this memorandum is further submitted in opposition to that morion.

**BACKGROUND**

The plaintiff, Vincent Rose, was a candidate for Seventh Ward Alderman in the City of Chicago in the recent election on February 24, 2015. His nominating petitions were challenged in two separate administrative proceedings by two objectors. After a records examination and hearing before a hearing officer, the Chicago Board of Elections ruled that plaintiff submitted 414 valid signatures, short of the required 473. The Board ruled that plaintiff should not be placed on the ballot. There were two administrative decisions by the Chicago Board because two separate objections were filed. The primary decision was in administrative case 15-EB-ALD-109. The decision in 15-EB-ALD-163 was rendered moot by the decision in the lower-numbered case.

(The hearing officer recommendations and Board decisions in both administrative cases are attached as Exhibit A to this memorandum). A striking pattern of fraud was discovered in the records examination process when signatures were examined. (Ex. A., hearing officer recommendation in 15-ALD-EB-163 at 1214 and 15). This Court may take judicial notice of official administrative decisions of this type on a Rule 12(b)(6) motion, as well as the related decision and final judgment entered by the Circuit Court of Cook County. *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir. 1994).

Plaintiff filed two petitions for administrative review, *Rose v. Board of Election Commissioners,* 15 COEL 11 and 12, in the Circuit Court of Cook County as permitted by 10 ILCS 5/10-10.1(a). He alleged a variety of claims in state court, many of which overlap with his federal complaint. Plaintiff's initial "Candidate's Petition for Review" challenged the 4% signature requirement needed for aldermanic candidates to get on the ballot (which we will address in more detail in the argument section of this memorandum). Plaintiff alleged in his petition that the signature requirement (particularly in the first election after a ward remap following the decennial census), violated the First Amendment (Ex. B at 5), deprived him of equal protection, *id.* at 5 and 7, and due process, *id.* at 6. During the briefing on the petition for administrative review, plaintiff filed an "Amended Memorandum of Law in Support of Plaintiff's Position." (Ex. C). This document raised new legal theories not in the original petition, and defendants raised questions about whether issues not raised in the formal petition were actually preserved. The "Amended Memorandum" raised claims under the federal Voting Rights Act, 52 USC § 10301 and 10101 (what plaintiff denoted as "Legal Issues 1 and 2"); "Violation of Plaintiff's Right to Free Speech and Freedom of Association" ("Count 3");

"Violation of the Equal Protection Clause" ("Count 4"); Violation of Illinois Constitution (provisions in Article 3 that elections be free and equal and that the right to vote not be denied on the basis of race color ethnicity, status as member of a language minority, national origin, religion, sex, sexual orientation, or income)("Legal Issue 5"); "Violation of Due Process" ("Legal Issue 6"); and "Violation of Single Subject Rule," a claim based on Article IV, section 8(d) of the Illinois Constitution that bills be limited to a single subject ( "Legal Issue 7").

 Despite the question of whether any number of these claims was preserved because not adequately pled in the original petition, the defendants addressed them all on the merits as did the Court (Judge Maureen Ward Kirby of the County Division of the Circuit Court of Cook County). All the claims were rejected, and a final judgment was entered on February 3, 2015. (Ex. D). No appeal was taken from this decision. Plaintiff's name did not appear on the ballot on February 24, 2015. (Under Illinois law, aldermanic and mayoral elections are not run as a partisan primary followed by a general election. If no candidate receives a majority vote in the general election in February, there is a runoff election on the first Tuesday of April.) See 65 ILCS 20/21-26; 65 ILCS 20/21-25.

 Plaintiffs' federal lawsuit was filed on January 15, 2015. He did not move for a preliminary injunction until March 8, 2015, seeking to invalidate the election results weeks after it has occurred. He also seeks to have his name appear on the April 7, 2015, ballot.

 Plaintiff's claims in this case are the identical federal claims he raised in the state judicial review case: the same two Voting Rights Act statutes are cited, free speech, freedom of association, equal protection, and due process. He also adds a Count 6, "Violation of Civil Rights under Section 1983" which adds no new content and merely incorporates by reference his other

federal claims.[1] (Doc. 5 at page 22 of 28).

**THE CHALLENGED STATUTE**

For an aldermanic election, Illinois law as a general rule calculates the number of petitions needed as a percentage of the number of those who voted for alderman at the last election. That number is 4%. 65 ILCS 20/21-28(a), as amended by P.A. 98-115, eff. July 29, 2013. In the 2013 amendment, the Legislature recently raised the percentage from 2% to 4%. For the first election after an aldermanic remap (the situation for the 2015 elections, there having been a remap in 2012), the number of signatures needed is calculated by taking 4% of the total number of votes cast for mayor at the last mayoral election, divided by 50 (there are 50 Chicago wards). *Id.* That yields a number of 473 valid signatures needed for aldermanic candidates in all 50 wards. (Ex. E at 2).

**ARGUMENT**

The complaint fails to state a claim upon which relief can be granted. First, naming the "State of Illinois" as a defendant in this case is barred by the Eleventh Amendment, and the state is not a "person" that can be sued under 42 USC § 1983. Second, the plaintiff, as an unsuccessful candidate for public office, does not have standing to sue under the Voting Rights Act. Third, principles of claim preclusion bar plaintiff from litigating the merits in this court after a final judgment in the state court on the same claims. Fourth, even if this Court were to reach the merits, the signature requirement is constitutional. It is a reasonable, nondiscriminatory measure

---

[1]Section 1983 is not a source of rights and therefore one cannot plead a stand-alone violation of section 1983. Section 1983 is a vehicle by which one asserts violations of other federal rights. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617 (1979); *Conforti v. Wal-Mart Stores, Inc.,* 2013 WL 4432027 at *3 (D.N.J. 2013).

designed to insure candidates demonstrate a reasonable modicum of support before being placed on the ballot.

    **I.    THE "STATE OF ILLINOIS" IS NOT A PROPER DEFENDANT TO THIS CASE. THE ELEVENTH AMENDMENT PREVENTS THE JOINDER OF THE STATE. THE STATE IS NOT A "PERSON" UNDER 42 USC §1983.**

The election at issue here does not involve a statewide office and is not supervised by the Illinois State Board of Elections. The Chicago Board of Elections conducted the records examination and the administrative hearing which found plaintiff had an insufficient number of signatures and ruled that plaintiff not be placed on the ballot as a candidate for alderman. Plaintiff has joined the State of Illinois as a party. No state official is involved in the case and no joinder of the State or a state official is required for plaintiff's claim to proceed against the local governmental body.

The proper procedure when a suit is brought challenging the constitutionality of a state law which does not involve a state official as a proper defendant is set forth in 28 U.S.C. § 2403(b). In that situation, the state attorney general is to be notified and the State is permitted to intervene if necessary for argument on the constitutional question. It is not correct, as plaintiffs appeared to assert in court on March 11, 2015, that the State of Illinois or the Attorney General is the only proper party that can defend the constitutionality of a state statute. Certainly a local governmental entity sued in a federal civil rights case can defend itself by asserting the challenged law's constitutionality.

But assuming plaintiff intends to make the state a direct defendant in the case, there are numerous prohibitions. The Eleventh Amendment bars suit against the state unless there has been a waiver by the state of its Eleventh Amendment immunity or Congress has abrogated it clearly

and unequivocally.[2] Constitutional claims against the State brought under 42 U.S.C. § 1983 would be barred by the Eleventh Amendment. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100-01 (1984); *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Administration,* 603 F.3d 365, 370 (7th Cir. 2010)(en banc). In addition, the State is not a "person" that can be sued under Section 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58 (1989). The Eleventh Amendment bar would apply to Counts 3-6 of the complaint. It would not apply to Counts 1 and 2, the Voting Rights Act claims, because Congress has abrogated the Eleventh Amendment for those claims. *Katzenbach v. Morgan,* 384 U.S. 641, 648-650 (1966). But as we discuss in the next section, plaintiff, as a candidate, lacks standing to sue under the Voting Rights Act.

## II. PLAINTIFF, AS A CANDIDATE FOR OFFICE, LACKS STANDING TO SUE UNDER THE VOTING RIGHTS ACT.

Counts I and II allege violations of 52 U.S.C. § 10301 and 52 U.S.C. § 10101, provisions of the Voting Rights Act. Section 10101 guarantees the right to vote without racial discrimination; section 10301 provides that no voting qualification or prerequisite to voting shall be used to deny someone the right to vote based on race. These sections protect voters, not candidates. An unsuccessful candidate challenging election results does not have standing to sue under the Voting Rights Act. *Roberts v. Wamser,* 883 F.2d 617, 621 (8th Cir. 1989); *White-Battle v. Democratic Party of Virginia,* 323 F.Supp.2d 696, 702-03 (E.D. Va. 2004); *McGee v.*

---

[2]The Eleventh Amendment bar has traditionally been thought to be a matter of subject matter jurisdiction, though some more recent cases treat it more as an immunity from suit, because unlike subject matter jurisdiction, a state can waive the protections of the Eleventh Amendment. See e.g., *Smith v. Dept of Agriculture*, 23 F.3d 1134, 1139-40 (7th Cir. 1994); *Kennedy v. National Juvenile Detention Association*, 187 F.3d 690, 696 (7th Cir. 1999).

*Warrenville Heights,* 16 F.Supp.2d 837, 845-46 (N.D. Ohio 1998); *Oh v. Philadelphia County Board of Elections,* 2008 WL 4787583 at *7 (E.D. Pa. 2008).

### III. PLAINTIFF'S CLAIMS WERE ALL DECIDED IN STATE COURT. CLAIM PRECLUSION BARS HIS ATTEMPT TO RE-LITIGATE THOSE CLAIMS IN FEDERAL COURT.

Under 28 U.S.C. § 1738, a federal court must give full faith and credit to the judgments of the state court. That is, a federal court must apply the same preclusive effect to a state court judgment that a state court would. This general principle applies in civil rights cases as any other. *Allen v. McCurry,* 449 U.S. 90, 104-05 (1980). Here, plaintiff had a full judicial review hearing (we use the term "judicial review" to be synonymous with "administrative view" because election law cases, though in effect the same procedurally, are not governed by the Illinois Administrative Review Law, but by a separate section in the Election Code, 10 ILCS 5/10-10.1). In Illinois, judicial review of election board decisions is considered the same as administrative review and is governed by the same legal standards. *Jackson v. Board of Election Commissioners of City of Chicago,* 2012 IL 111928 at ¶46. Under Illinois law, for claim preclusion (res judicata) to apply, the decision of the circuit court affirming the decision of the Chicago Board of Elections must: (1) have reached a final judgment on the merits; (2) involve the same parties or their privies as the current claims; and (3) constitute the same cause of action as the current claims. *Garcia v. Village of Mount Prospect,* 360 F.3d 630, 635 (7th Cir. 2004); *Dookeran v. County of Cook, Illinois,* 719 F.3d 570, 575 (7th Cir. 2013). Indeed, Illinois law is broader than that–it is not just claims that were raised in the first suit that are barred, but those that could have been raised. *Dookeran, id.* at 576.

There is no question the decision entered by Judge Kirby has binding preclusive effect

here. It was a final, on the merits ruling taken after the parties had a full opportunity to brief all the issues. The decision was not appealed and the time to do so has expired. The same parties were involved in the state case as here. The claims decided by Judge Kirby are identical to those raised again here.

Final judgments of Illinois courts in administrative or judicial review have preclusive effect under Illinois law, *City of Rockford v. Unit Six of Policeman's Benevolent and Protective Association of Illinois,* 362 Ill.App.3d 556 (2nd Dist. 1995), and therefore, under 28 U.S.C. § 1738, follow-on suits are precluded in federal court. Numerous cases from our circuit have so held. "A judgment of a state court sitting in an administrative review capacity will have preclusive effect on claims and issues brought in subsequent lawsuits according to the law of the state where the judgment was rendered." *Garcia, id.* at 634 (7th Cir. 2004). See also *Hayes v. City of Chicago,* 670 F.3d 810 (7th Cir. 2012); *Rogers v. Desiderio,* 58 F.3d 299, 301 (7th Cir. 1995); *Link v. Village of Wadsworth,* 1996 WL 197513 at *4-5 (N.D. Ill. 1996); *Palacios v. City of Chicago,* 2008 WL 517141 at *5 (N.D. Ill. 2008) *Girot v. Municipal Officers Electoral Board of the City of Braidwood,* 2006 WL 59393 (N. D. Ill. 2006). All of these decisions applied res judicata after Illinois courts ruled on the merits in an administrative review case, as to claims that were raised or could have been raised in the state case.

**IV. THE SIGNATURE REQUIREMENTS NEEDED TO OBTAIN BALLOT ACCESS FOR THE OFFICE OF ALDERMAN ARE CONSTITUTIONAL.**

It is highly likely this Court will not need to reach the merits of this case, but since we have covered the ground already in the state case, we will again present the argument that a 4% signature requirement is well within constitutional limits.

The First Amendment protects the rights of persons to associate and form political parties and seek access to the ballot, and of voters to vote for the candidate of their choice. At the same time, courts have long recognized that the States have the authority to conduct elections for state and federal offices, see Art. 1 §4 of U.S. Constitution, and that the management of elections necessarily demands considerable and close regulation. Elections and the process of running an election are extraordinarily complicated administrative tasks; ballot space is finite and cannot accommodate everybody; and if the process is to function at all, detailed state laws are necessary. One need only to skim the Illinois Election Code to see the level of detail it provides. "As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown,* 415 U.S. 724, 730 (1974). See also *Navarro v. Neal,* –F.3d–, 2013 WL 2121086 at *4 (7th Cir.)(May 3, 2013); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th Cir. 1997); *Stone v. Board of Election Commissioners for the City of Chicago,* 2011 WL 66040 (Dow, J.). One requirement is that candidates and new parties demonstrate a requisite modicum of support to get on the ballot. *Libertarian Party of Illinois,* 108 F.3d at 774. The State does not have to make "a particularized showing of voter confusion, ballot overcrowding, or the presence of frivolous candidates prior to the imposition of reasonable restrictions on ballot access." *Id.,* quoting *Munro v. Socialist Workers Party,* 479 U.S. 189, 194-195 (1986).

When evaluating whether a state law infringes a First Amendment right, courts apply the balancing test derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), *Burdick v. Takushi,* 504 U.S. 428 (1992), and *Timmons v. Twin Cities Area New Party,* 520 U.S. 351 (1997). Under this test, courts weigh the "character and magnitude" of the burden imposed by the State's rule

against the interests the State contends justify the burden. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick,* 504 U.S. at 434 (internal citations and quotation marks omitted). In assessing the "character and magnitude" of the asserted injury, the Court must evaluate the alleged burden not "in isolation, but within the context of the state's overall scheme of election regulations." *Lerman v. Board of Elections in City of New York,* 232 F.3d 135, 145 (2nd Cir. 2000). "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock v. Carter,* 405 U.S. 134, 143 (1972).

Both federal and Illinois courts have applied the same framework in judging the constitutionality of ballot access restrictions. See, *e.g., Green Party v. Henrichs,* 355 Ill.App.3d 445, 447 (3rd Dist. 2005); *Druck v. Illinois State Board of Elections,* 387 Ill.App.3d 144, 150-51 (1st Dist. 2008). Both federal and Illinois courts recognize that "States...have an interest in limiting ballot access to serious candidates who can demonstrate a measurable quantum of support or a measure of political viability." *Druck, id.* at 151. "The preliminary demonstration of a significant modicum of support furthers the state's legitimate interest in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.*, quoting *Libertarian Party of Illinois v. Rednour,* 108 F.3d 768, 774 (7th Cir. 1997) and *Jenness v. Fortson,* 403 U.S. 431, 442 (1971).

Plaintiff claims the move from 2% to 4% is unconstitutional, but numerous cases have

upheld 5% as a reasonable benchmark for showing a reasonable modicum of support. *Libertarian Party v. Rednour,* 108 F.3d 768 (7th Cir. 1997)(upholding 5% requirement for new political parties seeking statewide ballot access); *Jenness v. Fortson,* 403 U.S. 431 (1971)(upholding 5% requirement for candidate not winning primary election to get on the ballot); *Norman v. Reed,* 502 U.S. 279 (1992)(Illinois law at issue; upholding 5% signature requirement, not to exceed 25,000 signatures in Cook County and Chicago); *Druck v. Illinois State Board of Elections,* 387 Ill.App.3d 144, 152 (5% requirement, based on voters who voted in the next preceding election in the relevant election district, "a reasonable and nondiscriminatory way to have the new party and its candidate...demonstrate a reasonable modicum of support"). Most recently, in *Stone v. Board of Election Commissioners for City of Chicago,* 750 F.3d 678 (7th Cir. 2014), the Court held that "In light of cases like *Jenness* and *Norman,* we have said that 'plaintiffs cannot argue' that even a '5% petitioning requirement is severe on its face.' *Id.* at 684.

  Plaintiff also challenges the provision in the statute governing the number of signatures needed after a remap. After ward boundaries change because of redistricting, it would no longer make sense to use the totals of a prior election's aldermanic turnout in that ward as the benchmark for a new election. Borders of the ward will change as population shifts, and population totals in the new ward boundaries might change to some degree. The old ward is no longer a useful benchmark for calculating a percentage of voters needed for signatures in a ward with new boundaries–imagine the confusion if candidates in the new Seventh Ward had to circulate petitions in what was the old Seventh Ward. Candidates in all 50 wards would be working to demonstrate a "modicum of support" in an area they wouldn't be elected from.

  When this situation occurs, the legislature has used a different measure. Here, it uses the

vote totals for the larger unit of government which has not changed, the city, and the vote total for mayor, divided by 50 (the number of city wards). Taking 4% of that number (as opposed to 4% of the ward-by-ward totals for alderman in the prior election) yields an number of 473 signatures. This formula provides an equal number for all 50 wards. As plaintiff notes in his pleading, for some wards, 473 may be more than the signatures needed in a previously drawn ward as it was before the remap. In other wards, with higher turnout, the 473 number may be less. Regardless, the constitutionally relevant number is the percentage, and 4% is clearly constitutional. For the Seventh Ward, the one at issue here, the 473 requirement is very close to the number required if one used 4% of the 2011 aldermanic total–4% of 11,745 equals 469, very close to the 473 needed under the new formula.[3]

In *Druck,* the court upheld as constitutional the process of using a different benchmark after a redistricting. For the first election after redistricting for a congressional redistricting, the requirement was 5,000 signatures for a new party candidate. For other elections, it was a 5% requirement. The court stated: "We have also found that the signature requirements in section 10-2 [of the Election Code] for new parties and their candidates, (1) signatures from 5,000 voters for the first election that follows redistricting and (2) signatures from 5% of the voters in the district subsequent to the first election following redistricting, are reasonable and nondiscriminatory." 387 Ill.App.3d at 157. Again, if a 5% requirement is constitutional, a 4% requirement is well within the constitutional limit. To the same effect is an earlier case, *Stout v. Black,* 8 Ill.App.3d 167 (2nd Dist. 1972), upholding the same 5,000 requirement after a redistricting and noting the

---

[3]In his complaint at ¶ 13, plaintiff cites a different number, 12,345. His exhibits 1 and 2 submitted with the complaint notes the Seventh Ward number as 11,745. The discrepancy may be between the total number of votes cast in the ward and those cast for alderman.

actual percentage in that instance was "less than the 5% requirement" upheld in an earlier case. *Id.* at 172.

As Judge Kirby noted in her decision in the state cases, eight candidates did successfully mange to gain ballot access in the Seventh Ward in February, suggesting the 473 signature number (and the 4% requirement) hardly constitute insuperable obstacles to ballot access. (Ex. D at 4).

### V. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED.

A preliminary injunction is "an extraordinary remedy", *Mazurek v. Armstrong,* 520 U.S. 668, 972 (1997), and "the exercise of a far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc.,* 549 F.3d 1079, 1085-86 (7th Cir. 2008). To obtain a preliminary injunction, the plaintiff has the burden of establishing that he has some likelihood of success on the merits, and that he will suffer irreparable injury and has no adequate remedy at law. If this showing is made, then the court considers the competing harms to the parties if the injunction is granted or denied and also considers the public interest. *Wisconsin Right to Life v. Barland,* 751 F.3d 804, 830 (7th Cir. 2014).

For the reasons stated in the earlier sections of this brief, plaintiff has no likelihood of success on the merits. And needless to say, an injunction invalidating an entire aldermanic election which occurred in February and having plaintiff's name put on the ballot would harm the electoral process and the public interest, and be manifestly disruptive and inequitable. It would also be unfair to candidates who legitimately obtained the necessary number of signatures and

competed fairly in the election. Plaintiff had ample time before the election to obtain an adjudication in this Court about the 4% number. Now, a state court has definitively answered the question about the constitutionality of the signature requirement. Plaintiff has made no showing that would cause this Court to take the extraordinary step of interfering with an aldermanic runoff election occurring in just a few weeks on April 7.

**CONCLUSION**

The defendant, the State of Illinois, requests that its motion to dismiss be granted and that plaintiff's motion for preliminary injunction be denied.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By: s/Thomas Ioppolo
THOMAS A. IOPPOLO
Assistant Attorney General
General Law Bureau
100 W. Randolph Street, 13th Fl.
Chicago, Illinois 60601
(312) 814-7198