IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VINCENT ROSE, )<br>)<br>        Plaintiff, )<br>)<br>  v. )<br>BOARD OF ELECTION )<br>COMMISSIONERS FOR THE CITY OF )<br>CHICAGO, et al., )<br>)<br>        Defendants. ) | No.: 15-cv-000382<br><br>Judge Amy St. Eve |

**BOARD OF ELECTION COMMISSIONERS FOR THE CITY OF CHICAGO'S
MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

**BACKGROUND**

Plaintiff Rose challenges the constitutionality of an Illinois statute prescribing the minimum number of signatures required on candidate nominating petitions for Alderman of the 7th Ward at the February 24, 2015 Municipal General Election in the City of Chicago.

In Chicago, Aldermen in each of the City's 50 wards are elected in nonpartisan elections. *See*, 65 ILCS 20/21-5, 20/21-12, 20/21-32. The candidate receiving a majority of the votes cast for each such office at the election held quadrennially in February of odd-numbered years is declared elected; however, if no candidate receives a majority of the votes cast in such election, a runoff election is held in April of such year when only the names of the candidate receiving the highest and second highest number of votes at the February election shall appear on the ballot. *See*, 65 ILCS 20/21-22, 20/21-25 and 20/21-26; 10 ILCS 5/2A-1.1(b) and 5/2A-1.2(d). The candidate receiving the highest number of votes at the April runoff election is elected. Id.

Candidate petitions for Alderman must be signed by the number of legal voters of the ward as will aggregate not less than 4% of the total number of votes cast for Alderman in such ward at the last preceding general election. *See*, 65 ILCS 20/21-28(a), as amended by P.A. 98-

1

115, eff. July 29, 2013. Prior to 2013, the statute provided for a signature requirement of 2%.

However, since the last election for Alderman in 2011, the Chicago City Council redistricted ward boundaries in the city.[1] For an election following the redistricting of wards the legislature has prescribed a different test – petitions for nominations of candidates shall be signed by the number of legal voters of the ward as will aggregate not less than 4% of the total number of votes cast for mayor at the last preceding municipal election divided by the number of wards. Id. For the February 24, 2015 aldermanic election, a candidate for Alderman was required to submit a nominating petition containing not less than 473 signatures of legal voters of the ward.[2]

On November 18, 2014, Rose filed his nomination papers with Defendant Board of Election Commissioners for the City of Chicago (the "Board") seeking to be a candidate for Alderman of the 7th Ward of the City of Chicago in the February 24, 2015 Municipal General Election. See, Exhibit 1. Pursuant to 10 ILCS 5/10-8, two objections to Rose's nomination papers were filed by registered voters in the 7th Ward, each alleging that Rose's petitions did not meet the signature requirements for Alderman of the 7th Ward. In one case (15-EB-ALD-109, Chicago Electoral Bd. Jan. 15, 2015), the Board, acting as the duly constituted Electoral Board (see, 10 ILCS 5/10-9(6)), found that Rose's petitions contained 1,076 purportedly valid signatures of legal voters of the 7th Ward. However, objections to 662 of those signatures were

---

[1] The Chicago City Council is required, "On or before the first day of December, of the year following the year in which the national census is taken, and every ten years thereafter," to redistrict the city on the basis of the national census of the preceding year. 65 ILCS 20/21-38. Indeed, on January 19, 2012 the Chicago City Council adopted a Ward Redistricting Ordinance. See SO2012-582. On September 12, 2012, the City Council approved corrections to the ward boundaries. See, *Journal of Proceedings*, September 12, 2012, p. 33628.
   In *League of Women Voters v. City of Chicago*, 757 F.3d 722 (7th Cir. 2014), the U.S. Seventh Circuit of Appeals found that the Chicago City Council's 2012 redistricting ordinances and maps did not violate the Equal Protection Clause principle of "one person, one vote," which requires that officials be elected from voting districts with substantially equal populations. While the government must make "an honest and good-faith effort" to construct its districts as nearly of equal population as is practicable," mathematical precision is not required. 757 F.3d at 725.

[2] At the last preceding municipal election (February 22, 2011), 590,391 votes were cast for Mayor. Four percent (4%) of 590,391 is 23,615.64, which, divided by the number of wards (50), yields a minimum signature requirement of 472.3128, or, rounded up, 473.

sustained, leaving Rose with only 414 valid signatures, below the minimum signature requirement of 473. See, Exhibit 2. In the other case (15-EB-ALD-163, Chicago Electoral Bd. Jan. 15, 2015), the hearing officer concluded that twelve of Rose' petition sheets – sheets 41 through 46, 48, 50, and 52 through 55 – which were purportedly circulated by Rose, contained signatures "either entirely or substantially of common authorship" that exhibited evidence of a pattern of fraud and false swearing sufficient to warrant striking all petition sheets circulated by Rose. The hearing officer ultimately concluded, however, that the outcome in 15-EB-ALD-109 was controlling. See, Exhibit 3.

On January 20, 2015, Rose filed for judicial review of the Board's decisions in both cases with the Circuit Court of Cook County, Illinois, pursuant to 10 ILCS 5/10-10.1. These cases were consolidated and on February 3, 2015, the circuit court entered judgment on the merits denying the petitions for judicial review and affirming the decisions of the Board. See, Exhibit 4. In so holding, the court considered and rejected all of the same constitutional claims raised in the instant case before this Court. Rose did not file a timely notice of appeal within 30 days as required by Illinois Supreme Court Rule 303(a)(1). Hence the February 3, 2015 judgment of the Circuit Court of Cook County constitutes a final judgment on the merits. Rose's name was not printed on the ballot for the February 24, 2015 election in the 7th Ward.

Because no candidate in the 7th Ward in the February 24, 2015, election received a majority of votes cast for Alderman in that ward, a runoff supplementary election will be conducted on April 7, 2015 listing on the ballot only the names of the two candidates receiving the highest and second highest number of votes at the February 24, 2015. See, 65 ILCS 20/21-26. The candidate receiving the most votes on April 7 will be declared elected as Alderman.

**PRELIMINARY INJUNCTION STANDARD**

A preliminary injunction "'is an extraordinary and drastic remedy, one that should not be

3

granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (emphasis in original). Before this Court may grant a preliminary injunction, Plaintiff must demonstrate: (1) some likelihood of success on the merits; and (2) he has "no adequate remedy at law" and will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992), *citing Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). If Plaintiff can meet these threshold tests (which he cannot in this case), the Court would next consider (3) whether the non-moving party would suffer irreparable harm if preliminary relief were granted, "balancing that harm against the irreparable harm to the moving party if relief is denied;" and (4) the interests of the public. *Abbott*, 971 F.2d at 11-12. The Court then "weighs all four factors in deciding whether to grant the injunction." *Ibid.* at 12, *citing American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986).

## ARGUMENT

**I. PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS CONSTITUTIONAL CLAIM**

A. <u>Challenge to Illinois' Ballot Access Law Should be Evaluated Using Balancing Test Articulated Under *Anderson v. Celebrezze*</u>

When analyzing the constitutionality of a statute, a court must begin with the presumption that a legislative act is constitutional. *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

Without question, "[t]he First Amendment protects the right of citizens to associate and form political parties for the advancement of common political goals and ideals." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). "On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358. Reasonable restrictions may be

4

imposed on candidates because states have an interest in requiring a demonstration of qualification for office in order for elections to be run fairly and effectively. *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).

A constitutional challenge to Illinois' ballot access law must be evaluated using the balancing test articulated in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). The *Anderson*-type assessment of the constitutionality of ballot access laws is a two-step inquiry. *Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013). First, the court must determine whether the challenged law "imposes severe or reasonable and nondiscriminatory restrictions on candidates' and voters' constitutional rights so that we can ensure application of the appropriate level of scrutiny." *Id*. Second, the court must determine "whether the state interest offered in support of the law is sufficiently weighty under the appropriate level of scrutiny." *Id*.  For severe restrictions on voters' rights, the challenged statute must be narrowly tailored to advance a compelling state interest.  *Navarro*, 716 F.3d at 430.  For statutes that impose only "reasonable, nondiscriminatory restrictions," the state's "important regulatory interests are generally sufficient." *Id*.

B. <u>United States Supreme Court and Seventh Circuit Precedent Supports Constitutionality of 4% Petition Signature Requirement of 65 ILCS 20/21-28 (a).</u>

Plaintiff challenges the constitutionality of Illinois statute 65 ILCS 20/21-28(a), requiring aldermanic candidates seeking election at an election following the redistricting of wards to submit nomination papers signed by at least 4% of the total number of votes cast for mayor at the last preceding municipal election divided by the number of wards.  There is, however, abundant and persuasive jurisprudence from the United States Supreme Court, the Seventh Circuit and elsewhere upholding the constitutionality of similar and even more restrictive state requirements.

As U.S. Seventh Circuit Court of Appeals recently found, in assessing the burden to candidates seeking access to the 2011 municipal ballot for Mayor of the City of Chicago, to

reach the requisite 12,500 signatures, a potential candidate need only obtain signatures from "about 1% of the total number of registered voters in Chicago or (depending on turnout) about 2.5% of the votes cast in the last [2007] mayoral election. *Stone v. Board of Election Commissioners for the City of Chicago*, 750 F.3d 678, 683 (7th Cir. 2014). The court in *Stone* noted that "[T]he Supreme Court has approved of signature requirements as high at 5% of the eligible voting base," citing *Jenness v. Fortson*, 403 U.S. 431, 438 ("we cannot say that Georgia's 5% petition requirement violates the Constitution"), and *Norman v. Reed*, 502 U.S. 279, 295 (1992) (25,000 signatures needed to qualify for ballot in suburban Cook County corresponded to "only slightly more than 2% of suburban voters" was "considerably more lenient restriction than the [5% requirement] we upheld in *Jenness*"). *Stone* ultimately concluded that the 12,500 signature requirement, which is less restrictive than higher signature requirements upheld elsewhere by federal courts, did not create a severe or unconstitutional burden on ballot access. *Stone* said, "In light of cases like *Jenness* and *Norman*, we have said that plaintiffs 'cannot argue that' even a '5% petitioning requirement is severe on its face'," citing *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997). In *Rednour*, the Seventh Circuit, citing *Jenness,* upheld Illinois' 5% petitioning requirement, saying it "neither freezes the status quo of American political life, nor in any way abridges the rights of free speech and association secured by the First and Fourteenth Amendments." *Rednour*, 108 F.3d at 774.

There have been a number of other cases involving Illinois statutes where federal courts have expressly held or commented that a 5% signature requirement is constitutionally permissible. *See*, *e.g.*, *Jackson v. Ogilvie*, 325 F.Supp. 864, 868 (N.D. Ill. 1971), *aff'd*, 403 U.S. 925 (1971); *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979); and *Black v. Cook County Officers Electoral Board*, 750 F.Supp. 901, 908 (N.D. Ill. 1990). Two

6

of these cases—*Jackson* and *Socialist Workers Party*—specifically addressed the 5% signature requirements that previously governed City of Chicago mayoral elections.

Plaintiff complains that the 4% signature requirement of 65 ILCS 20/21-28(a) is excessive and not uniformly applied. He contends, for example, that in the 19th Ward, 473 signatures require a candidate to obtain 1.9% of *votes cast* in the prior ward election in 2011, but would require a candidate in the 22nd Ward to obtain 10.87% of the *votes cast* in the prior ward election. Rose argues that the 4% requirement is not equally open to participation by "Black, Asian, Pacific and all other minority class of citizens protected by the Statute." Plaintiff's Motion for Preliminary Injunction, p. 7. First, Rose is neither in the 19th Ward nor the 22nd Ward – he is running in the 7th Ward, so the numbers he cites have no application to him. Nor has Plaintiff alleged that he is a member of any or all of the racial classifications whose members' rights he seeks to assert. Accordingly, Plaintiff does not have standing to object to the constitutionality of the statute as applied to candidates in those wards or racial classifications. See, e.g., *Shaw v. Hunt*, 517 U.S. 899, 904, 116 S.Ct. 1894, 1900 (1996). Second, as for the argument that the resulting signature requirement is not uniformly applied, where candidates are elected in districts or wards that must be redistricted every ten years to comply with "one person, one vote" principles, some formula other than simply using a percentage of votes cast at the last election must be derived because is it virtually impossible to accurately calculate such percentages when district or ward boundaries change from the last election. Thus, for elections following a redistricting, the legislature has resorted to fixed numbers (e.g., 5,000 for Congressman, 3,000 for State Senator, 1,500 for State Representative) or a percentage (5% percent minimum, 8% maximum) of the number of votes cast in a county or municipality, divided by the number of districts or wards, for county board members, alderman or trustee. *See*,

7

10 ILCS 5/10-3. In *Stout v. Black*, 8 Ill.App.3d 167, 172 (1972), the Illinois Appellate Court approved of this statutory approach, noting that the 5,000 signature requirement for Congressman equaled only 2 or 3% of the registered voters in the candidate's district and that all districts were substantially equal in population. Here, as in *Stout*, all 50 wards of the City of Chicago are substantially equal in population. See, *League of Women Voters v. City of Chicago*, 757 F.3d 722 (7th Cir. 2014). So a signature requirement that is uniform in every ward in the City of Chicago that is substantially equal in population can hardly be said to be discriminatory.

Plaintiff argues that the statute's uniform signature requirement across all wards somehow dilutes "voting strength," citing *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801 (1963). Motion, p. 13. However, *Gray* dealt with apportionment and vote dilution among counties of *unequal* population. Here, we are not faced with vote dilution but rather with petition signature requirements among wards of *equal* population. For example, courts have uniformly upheld geographic distribution requirements for petition signature collection so long as they involve districts with equal population. See, e.g., *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012); *Libertarian Party of Virginia v. Davis*, 766 F.2d 865 (4th Cir. 1985); *Libertarian Party v. Bond*, 764 F.2d 538 (8th Cir. 1985).

Regarding his complaint that the 4% signature requirement is excessive, 473 signatures is only 1.5% of the number of registered voters (31,125) in the 7th Ward as of the November 4, 2014 general election, and about 3.1% of the number of ballots cast (15,501) at the same election, both well under the 5% of total registered voters approved in *Jenness*. See, Election Results, 2014 General Election – 11/4/14, *available at* http://www.chicagoelections.com. It's also only 3.8% of the total number of votes cast (12,345) at the last election for Alderman in the 7th Ward in February 2011. See, Election Results, 2011 Municipal General Election, *available at*

8

http://www.chicagoelections.com.

      C.    Signature Requirement Does Not Severely Burden Access to the Ballot

Moreover, Plaintiff's claim that the 4% signature requirement is onerous and restrictive is not supported by the history and facts arising out of this election. As the Seventh Circuit observed in *Stone*, "What is ultimately important is not the absolute or relative number of signatures required but whether a 'reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Stone*, 750 F.3d at 682.

Here, Rose originally sought to run for Alderman in the 7th Ward of the City of Chicago. In the end, eight (8) candidates qualified for the ballot and had their names printed on the February 24, 2015 Municipal General Election ballot for 7th Ward Alderman. See, Election Results, 2015 Municipal Election – 2/24/15, *available at* http://www.chicagoelections.com. This is actually two (2) more than the number of candidates who appeared on the ballot at the February 2011 election for Alderman in the 7th Ward, even though the signature requirement then was 2% of the ballots cast for Alderman in the previous (2007) aldermanic election. See, Election Results, 2011 Municipal General Election, *available at* http://www.chicagoelections.com. The fact that *more* candidates have qualified for the ballot under a supposedly higher signature requirement is hardly evidence that the current 4% signature requirement serves as a severe and unconstitutional barrier to ballot access.

Another important consideration here is the fact that the Plaintiff had, by statute, 90 days to circulate petition to obtain enough valid signatures of legal voters in the 7th Ward to qualify for the ballot.[3] Yet Rose's nomination papers show he obtained 773 signatures (300 more than

---

[3] Candidates for Alderman had 90 days prior to the last day of petition filing to circulate nominating petitions to obtain the signatures of legal voters in their respective wards. *See*, 10 ILCS 5/10-4. The last day to file nomination papers for the office of Alderman was November 24, 2014. *See*, 10 ILCS 5/10-6(4). The first day to begin circulating nominating petition sheets was, therefore, August 26, 2014.

9

the statutory minimum) on 40 petition sheets within the first three days of the petition circulation period. See Exhibit 1, pp. 000008-000047. He then obtained only 303 signatures in the remaining 87 days of the statutory circulation period. Again, this is hardly evidence that the statutory signature requirement of 473 imposed a severe burden on Plaintiff if he could obtain 773 signatures in three days and had 87 days to collect more.

    D.   <u>Illinois Has a Legitimate State Interest in Imposing a Reasonable Signature Requirement</u>

There can be little debate that a state can "impose reasonable restrictions on [ballot] access, as by requiring . . . that the would-be candidate demonstrate significant support for his candidacy by submitting thousands (or, depending on the size of the electorate, tens or even hundreds of thousands) of petitions in order to prevent the voter confusion that would be engendered by too long a ballot." *Protect Marriage Illinois*, 463 F.3d at 607-08.

Here, the signature requirement imposes a "reasonable, nondiscriminatory restriction," so it need be supported only by a legitimate state interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), the Supreme Court said, "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot -- the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."

States have a strong interest in preventing voter confusion by limiting ballot access to serious candidates who can demonstrate a measurable quantum of support or a level of political viability and that the "preliminary demonstration of a 'significant modicum of support' furthers the state's legitimate interest of 'avoiding confusion, deception, and even frustration of the democratic process at the general election'." *Rednour*, 108 F.3d at 774, quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). A signature requirement is warranted as a means "to

forestall frivolous candidacies and concomitant 'laundry list' ballots that merely serve to confuse the voter[.]" *Lubin v. Panish*, 415 U.S. 709, 718, 94 S.Ct. 1315 (1974). "Light regulation of ballot access could lead to an unmanageable number of frivolous candidates qualifying for the ballot, thereby confusing voters." *Navarro v. Neal*, 716 F.3d 425, 431 (7th Cir. 2013). "[R]elaxing or abolishing these signature requirements could attract a significant number of frivolous candidates, leading to phone book-sized ballots and widespread voter confusion." Id.

Here, 60 ILCS 20/21-28(a) imposes only a reasonable, nondiscriminatory restriction upon ballot access in Chicago elections for Alderman and it serves an important regulatory interest in preserving the integrity of those elections. As such, it is sufficiently weighty to justify the minimal burden it imposes on ballot access.

## II. THERE IS NO VIABLE CLAIM UNDER 52 U.S.C.A. §§ 10301 OR 10101

Plaintiff has no standing to bring a claim under 52 U.S.C.A. § 10301 (formerly 42 U.S.C. § 1973). He is acting in his capacity as a candidate who has been unsuccessful in his attempt to have his name printed on the ballot. It is well settled that unsuccessful candidates lack standing to sue under this section of the Voting Rights Act. See, *White-Battle v. Democratic Party of Virginia*, 323 F.Supp.2d 696, 702 (E.D. Virginia, 2004); *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) and *McGee v. City of Warrensville Heights*, 16 F.Supp.2d 837 (N.D. Ohio, 1998).

As amended, 52 U.S.C.A. § 10101 (formerly 42 U.S.C. § 1971) prohibits public or private actors from using different voting standards among persons qualified to vote, denying the right to vote due to immaterial errors in voter registration forms, or using literacy tests. *Thrasher v. Illinois Republican Party*, ___ F.Supp.2d ___, 2013 WL 442832, *3 (C.D. Ill. 2013). Clearly, this statute does not apply to minimum signature requirements to qualify candidates for the ballot. Moreover, it is questionable whether Petitioner has standing to assert a private right of action under this statute. 52 U.S.C.A. § 10101(c) provides that the Unites States Attorney

General – not private citizens – may institute actions to redress alleged violations of the statute. The majority of courts to address this issue have held that private plaintiffs lack standing to bring such suits. *Thrasher*, 2013 WL 442832, *4.

### III. CHALLENGED STATUTE DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE

Plaintiff does not specifically identity the class of aldermanic candidates he believes are receiving different treatment. Presumably it is race-based. But to demonstrate such a race-based classification under Equal Protection, he is required to prove that there is a discriminatory purpose behind the law. *Mobile v. Bolden*, 446 U.S. 55, 66, 100 S. Ct. 1490 (1980). Laws neutral on their face, but which happen to have a disparate impact on certain groups, do not necessarily violate the Equal Protection Clause absent such discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040 (1976). However, Plaintiff pleads no facts tending to show a discriminatory purpose.

### IV. THERE WAS NO DENIAL OF DUE PROCESS

Plaintiff complains that the examination of registration records was conducted prior to the City of Chicago's new voter registration records being updated and the results of the records examination were, therefore, not accurate. However, following the records examination in 15-EB-ALD-109, the Objector requested a hearing pursuant to Rule 8. See, Exhibit 2, pp. 000010-000011. He had an opportunity to present evidence and argument concerning the records examination. As shown by the hearing officer's findings and recommendations, however, the Petitioner "failed to present evidence to rehabilitate any of the signatures ruled invalid as a result of the records examination." Id. Given an opportunity to address any problems with the records examination process or results, the Petitioner did nothing. No deprivation of due process occurred.

Sections 10-8 through 10-10 of the Election Code create a method for hearing objections to candidate petitions. Section 10-10.1 of the Code then provides an aggrieved party an opportunity to seek judicial review of the electoral board's decision in the circuit courts. The combination of these two procedures satisfies due process. *See*, e.g., *Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458 (2nd Cir. 2006). The state's procedure for judicial review of the decisions of state electoral boards is an adequate remedy at law; thus, the state law remedy affords the parties due process of law. *Ament v. Kusper*, 370 F. Supp. 65, 68 (N.D. Ill. 1974).

### V. BALANCING HARMS TO THE PARTIES AND THE INTERESTS OF THE PUBLIC WEIGHS HEAVILY IN FAVOR OF DENIAL OF AN INJUNCTION

Additional factors to be weighed by the Court in deciding whether to grant an injunction include (a) whether the non-moving party would suffer irreparable harm if preliminary relief were granted, "balancing that harm against the irreparable harm to the moving party if relief is denied;" and (b) the interests of the public. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

Here, Plaintiff failed to diligently pursue their claims in this Court, much to the detriment and prejudice of the Defendants. The statute setting forth the signature requirements for candidates for Alderman was amended in 2013. By statute, Plaintiff could have begun circulating his petition sheets for signature as of August 26, 2014, and filed his nomination papers on November 18, 2014. Yet, Plaintiff waited until January 15, 2015 to file this action in this Court only after it became evident that, of the original 1,076 signatures appearing on his petitions, only 414 remained valid. Even then, Plaintiff waited until February 25, 2015 to file an amended complaint and until March 9, 2015 to serve his motion for preliminary injunction.

In the meantime, the Board conducted the February 24, 2015 Municipal General Election, and, because no candidate receive a majority of votes cast, will conduct a runoff election on

13

April 7, 2015 – three weeks away – in the 7th Ward between the two candidates who received the highest and second-highest number of votes at the February election. See, Exhibit 5, Declaration of Lance Gough ("Gough Declaration"), ¶ 8. Importantly, the printing of substantially all ballots in the 7th Ward of City of Chicago has been completed. Gough Declaration, ¶ 16. The Board began mailing absentee ballots on Friday, March 13, 2015. Gough Declaration, ¶ 24. Grace Period voting officially began on March 11, 2015. Early Voting is scheduled to begin on March 23, 2015. Gough Declaration, ¶ 21. To prepare for these events, sufficient quantities of touchscreen voting devices must be programmed and tested before they can be deployed for use in Grace Period and Early Voting. Such testing has already begun. Gough Declaration, ¶ 22.

In short, the Board's election preparations have been in full swing while Plaintiff stood on the sidelines. In addition to the costs involved in the rebooting of the election, any material delay occasioned by the reprinting and reprogramming of election equipment and the re-testing of the equipment places the integrity of the election itself in jeopardy. Absentee ballots already issued prior to entry of an injunction would have to be re-issued and older ballots replaced. Any attendant delay in the issuance of corrected absentee ballots or in the commencement of Grace Period and Early Voting may possibly disenfranchise voters who do not receive or cannot access a ballot in sufficient time to cast a ballot.

Courts have been reluctant to grant injunctive relief close to an election where plaintiffs were not diligent in pursuing their claims and election officials expended considerable time and money in preparing the election. See, e.g., *Williams v. Rhodes*, 393 U.S. 23, 35, 89 S.Ct. 5, 12 (1968) (at this late date it would be extremely difficult, if not impossible, to provide another set of ballots and the confusion that would attend such a last-minute change poses a risk of interference with the rights of voters); *McCarthy v. Briscoe*, 539 F.2d 1353, 1355 (5th Cir. 1976);

*Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990); *Nader v. Keith*, 385 F.3d 729, 736-737 (7th Cir. 2004) (candidate created a situation in which any remedial order would throw the state's election preparations into turmoil where absentee ballots had already been mailed to overseas voters; while denial of injunction might harm voters who supported candidate, last-minute injunction would harm other voters if injunction disrupts the election).

Any injunction at this late date would materially prejudice the Board and possibly disrupt the election. In addition, it disrupts the State's statutory scheme designed to ensure that Alderman are elected by a majority of votes cast, which is why a runoff election is limited to only the two candidates receiving the highest and second highest number of votes in February when no candidate receives a majority of votes at that election.

## CONCLUSION

For the reasons discussed above, the Plaintiff has little or no likelihood of success on the merits. In addition, Board would suffer irreparable financial and logistical harm if an injunction were granted. Finally, the interests of the public, i.e., the voters, would be materially and adversely affected by a last-minute injunction that could disrupt the election and cause confusion among voters. Therefore, the Board requests that preliminary injunction be denied.

Respectfully submitted,

City of Chicago Board of Election Commissioners, Langdon D. Neal, Marisel A. Hernandez, and Richard A. Cowen, Respondents

By: /s/ James M. Scanlon
Their attorney

James M. Scanlon
James M. Scanlon & Associates, P.C.
27 N. Wacker Dr. #502
Chicago, IL 60606
Tel. (312) 782-8163

15